Decision and Journal Entry
{¶ 1} Appellant, Jeff Wittman, appeals from a jury verdict in the Summit County Court of Common Pleas denying him relief for his retaliation, aiding and abetting discrimination, and civil conspiracy claims against Appellee, the City of Akron. We affirm.
{¶ 2} In September of 1999, Appellant filed a claim against Appellee alleging retaliation, under R.C. 4112.02(I), aiding and abetting discrimination, under R.C. 4112.02(J), and civil conspiracy. Appellant claims that he suffered adverse action by Appellee, his employer, because Appellant's wife, also an employee of Appellee, filed an Ohio Civil Rights Commission complaint and a successful sexual harassment lawsuit against Appellee. Appellant states that Appellee disproportionately punished him, denied him deserved merit raises, and instituted a groundless criminal investigation against him due to the protected activities of him and his wife.
{¶ 3} A two week trial ensued in March 2002. Following Appellant's case, Appellee moved for a directed verdict, which the court denied. After closing arguments, over Appellant's objection, the judge charged the jury using a circumstantial rather than direct evidence instruction for Appellant's retaliation claim. The jury found Appellee not liable on all claims.
{¶ 4} Appellant then filed a Civ.R. 50(B) motion to set aside the verdict or, in the alternative, to grant a new trial under Civ.R. 59(A) on two separate grounds: undisclosed juror bias not revealed to a direct question during voir dire and the use of a circumstantial, instead of direct, evidence jury instruction. The court denied Appellant's motions, and Appellant timely appealed to this court. Appellant raises two assignments of error.
 ASSIGNMENT OF ERROR I "The trial court committed reversible error when it denied [Appellant] a new trial based upon undisclosed juror bias."
{¶ 5} In Appellant's first assignment of error, he argues that the trial court disregarded competent evidence of juror bias, and erred in failing to order a new trial on that ground. Appellant specifically argues that the affidavit of juror Eppling, detailing the undisclosed bias of two other jurors exhibited during jury deliberations, falls under an exception to the well established aliunde rule. Appellant continues by alleging that we should decide the issue de novo, rather than apply an abuse of discretion standard, because the trial court based its determination on a faulty proposition of law. We find Appellant's arguments to be without merit.
{¶ 6} Juror testimony is generally not admissible to impeach a jury verdict unless there is supporting evidence aliunde. Evid.R. 606(B);State v. Hessler (2000), 90 Ohio St.3d 108, 123. Evidence aliunde is extraneous, independent evidence of alleged conduct based on the firsthand knowledge of one who is not a juror. State v. Schiebel (1990),55 Ohio St.3d 71, 75. It is undisputed that no evidence aliunde supporting juror Eppling's affidavit has been presented to the court.
{¶ 7} Nonetheless, Appellant argues that juror Eppling's affidavit in this case falls within the one exception to the aliunde rule: no outside evidence is needed when the affidavit describes "any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court." Evid.R. 606(B). A juror, Appellant argues, is an officer of the court. Therefore, any impropriety by a juror that may influence juror deliberations should fall under this exception, and any affidavit to that effect should be admissible without the required evidence aliunde. Appellant's argument is seriously flawed.
{¶ 8} If this particular rule truly included jurors as officers of the court, the exception would permit admission of all juror affidavits without evidence aliunde as long as the affidavit spoke of improper behavior of another juror during jury deliberations. Affidavits regarding anything said or done by a juror that might have improperly influenced jury deliberations would be freely admitted without the required corroboration. This is clearly not what the rule intends.
{¶ 9} The current language of the rule specifically prevents all juror testimony regarding "any matter or statement occurring during the course of the jury's deliberations" that had any effect on the juror's "mind or emotions [that influenced] him to assent or dissent from the verdict" unless there is outside evidence. Evid.R. 606(B). Adoption of Appellant's allegations would destroy the protections afforded jurors by this rule, rendering this portion of the rule superfluous. It would also abandon the longstanding supporting public policy:
 "The policy of the law forbidding the impeachment of the verdict by affidavits of the juror is particularly exemplified when the attempt is to prove misconduct of the jurors while engaged in their deliberation, or for the purpose of showing improper motives or fraudulent or improper conduct of members of the jury." Wicker v. Cleveland (1948), 150 Ohio St. 434, 436.
{¶ 10} The rule is vital not only to protect jurors from harassment by defeated parties, but to ensure finality of verdicts and preserve the "sanctity of the jury room and the deliberations therein." State v.Hessler (2000), 90 Ohio St.3d 108, 123.
{¶ 11} Case law also supports the interpretation that jurors are not treated as officers of the court under Evid.R. 606(B). Courts regularly reject juror affidavits regarding deliberation impropriety and misconduct during jury deliberations. See Hessler, 90 Ohio St.3d at 122-24 (juror allegedly bullied into voting for the death penalty by demeaning and chastising remarks of other jurors); Schiebel, 55 Ohio St.3d at 76 (juror stated during deliberations that he hated Defendant and that his mother had a deposit with the failed bank in the case); State v. Cannon
(December 26, 1996), 9th Dist. Nos. 17549 and 17532, at 11-12 (jurors allegedly influenced during deliberations by mere presence and reputation of gang members attending the trial); Whiston v. Bio-Lab, Inc. (1993),85 Ohio App.3d 300, 308 (jurors allegedly prejudiced by conversation during deliberations about double tagging of exhibits).
{¶ 12} Appellant asserts that Farley v. Mayfield (June 30, 1986), 10th Dist. No. 86AP-19, permits consideration of affidavits detailing the failure of a juror to disclose bias in response to a question during voir dire. Appellant's reliance on Farley in this case is misplaced. Farley
specifically dealt with an affidavit by the actual juror who failed to disclose her bias in response to a question during voir dire. As illustrated by State v. Scott (Oct. 17, 1995), 10th Dist. No. 95APA03-334, Farley is clearly distinguishable from the present case.Farley dealt with a juror affidavit detailing that particular juror's failure to speak during voir dire. It did not relate to anything said or done in jury deliberations. In contrast, where the affidavit indicates juror bias exhibited primarily during jury deliberations, as in the case at bar, evidence aliunde must be introduced. Id.
{¶ 13} As the trial court did not commit an error of law in regard to the aliunde rule, this court will not disturb the trial court's ruling on a motion for a new trial unless there is an abuse of discretion. Sharpv. Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307, 312, citingBlakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Appellant has offered no evidence aliunde to support juror Eppling's affidavit. The affidavit is therefore not admissible, and the trial court did not abuse its discretion by denying Appellant's motion for a new trial. Appellant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "The trial court committed reversible error when it issued to the jury a McDonnell Douglas burden-shifting circumstantial evidence instruction instead of a direct evidence instruction when Appellant presented direct evidence of retaliation."
{¶ 14} Appellant next argues that the trial court erred by giving an erroneous jury instruction regarding circumstantial evidence of retaliation. Appellant alleges that the court "impermissibly reduced the burden that [Appellee] should rightfully have borne" by giving this jury instruction instead of the proper instruction on direct evidence of retaliation. Appellant's argument lacks merit.
{¶ 15} A plaintiff must establish a prima facie case of retaliation in one of two manners: (1) with direct evidence that adverse employment action was motivated by the employee's engagement in protected activity; or (2) with indirect evidence raising a presumption of discrimination as described by four elements established in McDonnell Douglas Corp. v.Green (1973), 411 U.S. 792, 802, 36 L.Ed.2d 668. Williams v. Time WarnerCable (June 24, 1998), 9th Dist. No. 18663, at 6. Appellant does not argue that he has met the McDonnell Douglas standard.
{¶ 16} To establish a direct evidence case, the employee must "`present evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent.'" Williams, supra, at 6, quoting Mauzy v. Kelly Services, Inc. (1996), 75 Ohio St.3d 578, paragraph one of the syllabus. "[The] employee must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination to establish a violation." Byrnes v. LCICommunication Holdings Co. (1996), 77 Ohio St.3d 125, 130. Isolated and ambiguous statements are not enough. Williams, supra, at 8. Four factors help differentiate between circumstantial and direct evidence of retaliation: (1) whether the comment was made by a decision-maker in the scope of their employment; (2) whether the comment related to the decision-making process; (3) whether the comment was an isolated remark; and (4) whether the comment was near in time to the alleged discriminatory act. Id. at 10, citing Cooley v. Carmike Cinemas, Inc.
(C.A. 6, 1994), 25 F.3d 1325, 1330.
{¶ 17} Once there is direct evidence that the protected activity was a motivating factor in the adverse treatment of the employee by his employer, the burden shifts to the employer to prove by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected activity. Price Waterhouse v. Hopkins (1989),490 U.S. 228, 249, 104 L.Ed.2d 268. This varies from the indirect method of proof where there is no true burden shifting to the employer: the employer must merely offer some evidence of a legitimate, non-discriminatory reason for the adverse action which the employee may then rebut. Harold v. Bridgestone/Firestone, Inc. (Sept. 16, 1998), 9th Dist. No. 18915, at 8.
{¶ 18} In the case at bar, Appellant claims that testimony by two witnesses, Cheryl Pethtel ("Pethtel") and Judy Koenig ("Koenig"), was direct evidence of retaliation. At trial, Pethtel, the secretary for one of Appellant's supervisors, testified that Appellant had received commendations for his work with Appellee until "[r]ight about the time that [Appellant's] wife filed a complaint with Civil Liberties or Civil Rights [Commission.]" Management then began "scrutinizing [Appellant's] work much more than anybody else *** to the point of being ridiculous. Looking for mistakes, watching where he went, watching his times, harassing him."
{¶ 19} Another secretary, Koenig, also testified generally about Appellant. She stated that management for Appellee spent half of their time from 1998 until 2002 on Appellant. During that time, Koenig indicated that she prepared eight disciplinary memos for Appellant to every one for other employees. None of this general testimony amounts to direct evidence; Koenig and Pethtel were not Appellant's supervisors and they were not making decisions in regard to Appellant. Rather, Appellant argues, these circumstances provide context for further testimony by Pethtel and Koenig showing direct evidence of retaliation.
{¶ 20} First, Pethtel testified that she asked one of Appellant's supervisors, Warren Walfish ("Walfish"), about the difference in treatment.
 "I stopped [Walfish] in the hall and I asked him, I said, `You know, Warren, what they are doing with [Appellant] isn't fair. You know what's going on?'
"And Warren told me — he says, first of all, life wasn't fair.
 "Second of all, he said, `Cheryl, I like [Appellant] *** but I can only do what I am told to do."
{¶ 21} Next, Koenig testified that she asked Walfish "why he seemed so obsessed with [Appellant]." Walfish allegedly stated that he really did not like doing it, but that he was getting instructions "direct from the top." Koenig also asked another supervisor, Greg McPeake ("McPeake"), a similar question, and received a virtually verbatim response: "I asked him why he was spending so much time on [Appellant] and all the paperwork and the phone calls. And his response was *** `I like [Appellant]. I really don't like doing this. It is direct from the top.'"
{¶ 22} While Pethtel's and Koenig's testimony may have raised an inference of retaliation, it was merely that — an inference. This is not direct evidence of retaliation. Later testimony by Walfish and McPeake during Appellee's evidence further weakened these inferences. Both supervisors testified that Appellant had a documented history of underproduction at work, falsified mileage requests, and did not get along at all with his direct supervisor because he felt angry that he had not received the promotion. Management also disciplined Appellant multiple times for inappropriate behavior with clients and contractors.
{¶ 23} Walfish then explained his "life isn't fair" comment to Pethtel:
 "Witness:*** [T]he first thing that [Pethtel] always said to me when she came into my office was, `It's not fair that dah-dah, dah-dah, dah-dah,' or, `It's not fair that he did this and he did that,' and my first response was always, `Life is not fair.' It was a running joke between the two of us.
"Court:That's just something you said all the time?
"Witness:All the time."
{¶ 24} Walfish also admitted having a conversation with Koenig about Appellant, but indicated that Appellant's own actions and failures forced Walfish to take disciplinary action:
 "What I recall from the conversation is [Koenig] asking me how I felt about spending so much time on [Appellant's] matters. And I told [Koenig] I really didn't like it. It just ate up all of my time and it put me behind in my work. And I wasn't doing the rest of my job. I was — I was playing ping pong with [Appellant]. And she asked me why I was doing it. And I said I didn't have a choice, I have to."
{¶ 25} McPeake did not recall having a specific conversation with Koenig about Appellant. He admitted that he spoke to higher management about Appellant, but only in the limited sense that he would discuss any other employee with upper management. He did not, as Koenig stated, have instructions "direct from the top" to do anything not warranted by Appellant's underproduction or client complaints.
{¶ 26} After viewing the testimony in context, two things are apparent. First, the comments in this case are not at all related to the decision making process itself. Instead, each comment occurred after the allegedly retaliatory decision had been made and discipline already administered. Second, and more importantly, each portion of allegedly direct evidence required multiple inferences in order to find evidence of retaliation against Appellant. The general observations by Pethtel and Koenig about the treatment of Appellant may have been warranted by Appellant's underproduction. Walfish's two comments and McPeake's one alleged comment could be interpreted as simple distaste for legitimate problems caused by Appellant. This is not direct evidence of retaliation. See Tessmer v. Nationwide Life Ins. Co. (Sept. 30, 1999), 10th Dist. No. 98AP-1278; Williams, supra, at 8-9; Cooley, 25 F.3d at 1330. Appellant's second assignment of error is overruled.
{¶ 27} Appellant's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.